UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

OHIO CASUALTY INS. CO.,

                              Plaintiff,

v.

LEWIS & CLINCH, INC. and NORTHBROOK NY,
LLC,

                              Defendants.
_____

7:12-CV-1872
(GTS/TWD)

APPEARANCES:                                OF COUNSEL:

HURWITZ & FINE, P.C.                        AUDREY A. SEELEY, ESQ.
  Counsel for Plaintiff
1300 Liberty Building
424 Main Street
Buffalo, NY 14202

BOND, SCHOENECK & KING, PLLC               JONATHAN B. FELLOWS, ESQ.
  Counsel for Defendant Lewis & Clinch
One Lincoln Center
Syracuse, NY 13202

THE CHARTWELL LAW OFFICES, LLP             JOHN M. WUTZ, ESQ.
  Counsel for Defendant Northbrook NY
1735 Market Street - 29th Floor
Philadelphia, PA 19103

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

        Currently before the Court, in this diversity-based declaratory judgment action filed by

Ohio Casualty Insurance Company ("Ohio Casualty") against Northbrook NY, LLC

("Northbrook") and Lewis & Clinch, Inc. ("Lewis & Clinch") (collectively, "Defendants"), are

motions for summary judgment by Ohio Casualty and Northbrook.  (Dkt. Nos. 22, 24.)  Lewis &

Clinch joins in Northbrook's motion and joins in Northbrook's opposition to Ohio Casualty's motion. (Dkt. No. 25.) For the reasons set forth below, Ohio Casualty's motion is granted in part and denied in part, and Northbrook's motion is granted in part and denied in part.

## I.     RELEVANT BACKGROUND

### A.     Plaintiff's Complaint

In its Complaint, Ohio Casualty seeks a declaration that it is neither obligated to defend nor indemnify Lewis & Clinch for Northbrook's claims against it in the action, *Northbrook NY LLC v. Lewis & Clinch, Inc.*, No. 7:09-CV-00792(GTS/TWD) ("the Underlying Action"). (Dkt. No. 1[Pl.'s Compl.].) In support, Ohio Casualty asserts the following.

In the Underlying Action, Northbrook asserted claims for negligence and breach of contract against Lewis & Clinch stemming from damage to a hydroelectric turbine unit ("Unit 2") at Northbrook's Hydroelectric Project in Glen Park, New York ("the Project") on January 9, 2008. In September 2007, Lewis & Clinch performed for Northbrook at the Project, on Unit 2, service, inspection, cleaning and/or adjustment to the wicket gates and removal, replacement, tightening and/or adjustment of every Ringfeder for each wicket gate. After an abnormal shutdown of Unit 2 during a disturbance on the National Power Grid on January 9, 2008, Unit 2 sustained damage to, among other things, its draft tube gate seals, which are also knows as tail race gates. Unit 2 was unable to generate power for approximately 54 days thereafter, resulting in an alleged loss of profits. Consequently, Northbrook commenced the Underlying Action in July 2009. In September 2012, Lewis & Clinch's motion for summary judgment in the Underlying Action was partially granted dismissing Northbrook's negligence cause of action. Therefore, Northbrook's sole remaining claim against Lewis & Clinch in the Underlying Action is for breach of contract.

Ohio Casualty issued a Commercial General Liability Policy to Lewis & Clinch, which was effective February 4, 2007 through February 4, 2008 ("the CGL Policy"). Ohio Casualty alleges that Lewis & Clinch's claims in the Underlying Action are not covered by the CGL Policy because, in the first instance, it does not allege an "occurrence" or "property damage" as defined in the insuring grant of the CGL Policy and, in the alternative, is excluded from coverage under one of several of the CGL Policy's exclusions.

Ohio Casualty issued a Commercial Umbrella Policy to Lewis & Clinch, which was effective September 27, 2007 through September 27, 2008 ("the Umbrella Policy"). Ohio Casualty alleges that Lewis & Clinch's claims in the Underlying Action are not covered by the Umbrella Policy because, in the first instance, it does not allege an "occurrence" or "property damage," or, in addition, regarding the breach of contract claim, an "insured contract" as defined in the insuring grant of the Umbrella Policy and, in the alternative, is excluded from coverage under one of several of the Umbrella Policy's exclusions.

Finally, Ohio Casualty alleges that Lewis & Clinch's claim for profits in the Underlying Action does not allege an "occurrence" or "property damage" within the insuring grant of the CGL Policy or the Umbrella Policy.

### B.     Parties' Arguments on Ohio Casualty's Motion

#### 1.     Ohio Casualty's Memorandum of Law in Chief

Generally, in its memorandum of law in chief, Ohio Casualty asserts five arguments: (1) the parties have entered into a stipulation of facts in this case and therefore, there should be no genuine issue of fact precluding summary judgment; (2) New York law applies to this dispute; (3) to the extent Lewis & Clinch seek indemnity for the Underlying Action for the breach of contract claim for damages to Unit 2's Ringfeders and wicket gates, those claims do not fall

within the Policies' insuring grant; (4)[1] Ohio Casualty is not obligated to indemnify Lewis &

Clinch for lost profits as they are not "property damage" within the Policies' insuring grant; and

(5) exclusions under the Policies bar coverage for indemnification of Lewis & Clinch for damage

to the Ringfeders and wicket gates. (Dkt. No. 23 [Ohio Casualty's Mem. of Law in Chief].)

### 2. Northbrook's Opposition Memorandum of Law

Generally, in its opposition memorandum of law, Northbrook asserts seven arguments:

(1) Northbrook's motion for summary judgment should be granted regarding three Policy

exclusions that were briefed by Northbrook in support of its motion but were not addressed by

Ohio Casualty in support of its motion for summary judgment; (2) Ohio Casualty is correct that

New York law governs this dispute; (3) because it is uncontested that Lewis & Clinch caused

physical injury to tangible property belonging to Northbrook, Ohio Casualty's arguments that its

Policies are not sureties or that faulty work is not an occurrence have no application to this case;

(4) the Policies cover Lewis & Clinch's liability for lost profits in the Underlying Action; (5) the

"damage to your product" exclusion in inapplicable to the claims in the Underlying Action; (6)

the "damage to your work" exclusion in inapplicable to the claims in the Underlying Action; and

(7) the "damage to impaired property" exclusion is inapplicable to the claims in the Underlying

Action. (Dkt. No. 28-1 [Northbrook's Opp'n Mem. of Law].)

### 3. Ohio Casualty's Reply Memorandum of Law

Generally, in its reply memorandum of law, Ohio Casualty asserts three arguments: (1)

the CGL Policy and Umbrella Policy do not insure damage to Unit 2's Ringfeders and wicket

gates; (2) Ohio Casualty is not obligated to indemnify Lewis & Clinch for lost profits as they are

---

[1]     Ohio Casualty mislabels its fourth and fifth arguments, or points, as a second
Point III and Point IV, respectively. (*See* Dkt. No. 23 at 7, 9, 18 [Ohio Casualty's Mem. of Law
in Chief].)

not "property damage" within the Policies' insuring grant; and (3) Ohio Casualty need only demonstrate that one exclusion under the Policies bars coverage for damage to the Ringfeders and wicket gates.  (Dkt. No. 29-1 [Ohio Casualty's Reply Mem. of Law].)

### C. Parties' Arguments on Northbrook's Motion

#### 1. Northbrook's Memorandum of Law in Chief

Generally, in its memorandum of law in chief, Northbrook asserts two arguments: (1) the physical damage to the draft tube gate seals and the resulting loss of use of the Unit 2 generator caused by Lewis & Clinch's faulty work constitutes an occurrence under the Policies and (2) Ohio Casualty has the burden of demonstrating the application of an exclusion.  (Dkt. No. 24-4 [Northbrook's Mem. of Law in Chief].)

#### 2. Ohio Casualty's Opposition Memorandum of Law

Generally, in its opposition memorandum of law, Ohio Casualty asserts five arguments: (1) New York law applies to this insurance coverage dispute; (2) Northbrook has not demonstrated that the Umbrella Policy affords insurance coverage in the Underlying Action; (3) Northbrook has not established that the breach of contract claim seeking recovery for damage to Unit 2's Ringfeders and wicket gates is within the Policies' insuring grant; (4) Ohio Casualty is not obligated to indemnify Lewis & Clinch for lost profits as they are not "property damage" within the Policies' insuring grant; and (5) exclusions under the Policies bar coverage for indemnification of Lewis & Clinch for damage to the Ringfeders and wicket gates.  (Dkt. No. 27-1 [Ohio Casualty's Opp'n Mem. of Law].)

#### 3. Northbrook's Reply Memorandum of Law

Generally, in its reply memorandum of law, Northbrook asserts three arguments: (1) Ohio Casualty's argument that there is no occurrence fails for several reasons; (2) the Policies

indemnify Lewis & Clinch for lost profits because (a) Ohio Casualty's argument to the contrary would render the Policies ambiguous, (b) the Court of Appeals for the Second Circuit has held that the CGL Policy covers lost profits, and (c) CGL Policies unequivocally cover lost profits under New York Law; and (3) the "impaired property" exclusion does not apply. (Dkt. No. 30-1 [Northbrook's Reply Mem. of Law].)

### D. Undisputed Material Facts

The parties have stipulated to certain facts for the purpose of this litigation. (*See* Dkt. No. 20 [Stipulation].) In support of its motion for summary judgment, Northbrook has also submitted a Statement of Material Facts. It is the position of Ohio Casualty that (1) the parties' Stipulation precluded the filing of Local Rule 7.1 Statements of Undisputed Material Facts, and (2) in any event, Northbrook's Statement does not comply with Local Rule 7.1 because it fails to set forth citations to the record where the facts are established. Moreover, Ohio Casualty objects to the admission of the report of Lee H. Sheldon, P.E., which is attached to Northbrook's Statement of Material Facts as Exhibit A, on the grounds that it is hearsay pursuant to Fed. R. Evid. 801.

Local Rule 7.1 states that "[a]ny motion for summary judgment *shall* contain a Statement of Material Facts." N.D.N.Y. L.R. 7.1(3) (emphasis added). In addition, the Rule requires that each fact listed in the Statement "shall set forth a specific citation to the record where the fact is established." *Id.* Finally, the Rule provides that "[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." *Id.* (emphasis in original).

Here, to be sure, the Stipulation makes no reference to the parties' desire that it serve to be the exclusive list of undisputed material facts such that it eliminates the necessity for the

filing of Rule 7.1 Statements. Given that Northbrook's Statement of Material Facts does not contain citations to the record as required by Rule 7.1[2] and that Ohio Casualty has failed to file a Rule 7.1. Statement, instead highlighting certain of the stipulated facts by attorney affidavit, the Court will consider only the undisputed facts in the Stipulation as well as the provisions of the Policies when deciding the current motions for summary judgment.

The following material facts are included in the Stipulation.

On January 9, 2008, disturbances on the National Power Grid power lines tripped all three of the Project's hydro turbine units off line ("the incident"). Although Units 1 and 3 shut down normally, several wicket gates for Unit 2 failed to close, which allowed water to continue to flow through the turbine. The continuous flow of water during the shutdown allowed the Unit 2 turbine to continue rotating, and cause the turbine's speed to dangerously increase. An overspeed protection device within Unit 2 sensed the increasing turbine speed, which signaled the draft tube gate to close in an effort to stop the water and prevent a potentially catastrophic overspeed condition. The operation of the overspeed device triggering the closing of the draft tube gates, ultimately shut down Unit 2.

Following the incident, while Units 1 and 3 restarted without issue, Unit 2 failed to restart. Unit 2 could not restart until it was dewatered; however this required the repair of the draft tube gate seals. These draft tube gate seals were damaged when the draft tube gates for

---

[2]       The Court will not consider the report attached to Northbrook's Statement of Material Facts for the following two reasons, which are not exhaustive. First, the report is not authenticated, having not been introduced by attorney affidavit or otherwise. Second, the report contains opinion evidence, and there is no indication in the record that the declarant has been properly determined to be an expert. "[P]rinciples governing admissibility of evidence do not change on a motion for summary judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)). Because, at this point, the report is inadmissible on multiple grounds, it will not be considered in deciding the current motions for summary judgment.

Unit 2 were forced closed against the excessively high volume and velocity of water flowing through the open wicket gates during the incident. After new draft tube gate seals were fabricated and installed, Unit 2 was repaired and returned to service on March 3, 2008.

Approximately four months prior to the incident, in September 2007, Lewis & Clinch performed mechanical services on Unit 2, including inspecting, cleaning, and adjusting the wicket gates, and removing, replacing, tightening, and readjusting every Ringfeder for each wicket gate. The damaged draft tube gate seals were outside the scope of work performed by Lewis & Clinch in September 2007. The damaged seals are not components of the Unit 2 turbine, the wicket gate, the Ringfeders or the control mechanism for the Ringfeders and wicket gate. Nor are the damaged seals attached to or contiguous with the Unit 2 wicket gate, Ringfeders or wicket gate control mechanism on which Lewis & Clinch performed its September 2007 work.

Northbrook intends to prove at trial that, as a result of the incident, damages to Unit 2 amounted to $135, 959.00, $99,900.00 of which is attributed to the replacement cost of the draft tube gate seals. In addition, Northbrook intends to prove that, as a result of the 54-day outage, it suffered $759,686.00 in lost revenues.

At the time of the incident, the Policies were in effect. The Insuring Agreement of the CGL Policy provides, in relevant part, that Ohio Casualty "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and that the insurance "applies to 'bodily injury' and 'property damage' only if[,]" among other things, it "is caused by an 'occurrence' that takes place in the 'coverage territory'." (Dkt. No. 21-1 at 38 [Stipulated Joint R., Ex. A].) The Insuring Agreement of the Umbrella Policy contains similar language, stating coverage for "bodily

injury" and "property damage" caused by an "occurrence."  (Dkt. No. 21-2 at 6 [Stipulated Joint

R., Ex. B].)

The Policies define "property damage" as

> 1.　Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use will be deemed to occur at the time of the physical injury that caused it; or
> 2.　Loss of use of tangible property that is not physically injured.  All such loss of use will be deemed to occur at the time of the "occurrence" that caused it.

(No. 21-1 at 34 [Stipulated Joint R., Ex. A]; Dkt. No. 21-2 at 14 [Stipulated Joint R., Ex. B].)  As

is relevant here, the Policies define "occurrence" as "an accident, including continuous or

repeated exposure to substantially the same general harmful conditions."  (No. 21-1 at 34

[Stipulated Joint R., Ex. A]; Dkt. No. 21-2 at 13 [Stipulated Joint R., Ex. B].)

The CGL Policy excludes from coverage, among other things,

> k.　Damage To Your Product
> "Property damage" to "your product" arising out of it or any part of it.
>
> l.　Damage To Your Work
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
>
> m.　Damage To Impaired Property Or Property Not Physically Injured
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
> (1)　A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

        (2)     A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(No. 21-1 at 25 [Stipulated Joint R., Ex. A].)  The Umbrella Policy excludes from coverage, among other things,

      1.b.    Any "property damage":
        (1)     to "your product" arising out of it or any part of it;
        (2)     to "your work" arising out of it or any part of it and included in the "products-completed operations hazard"[.]

(No. 21-2 at 26 [Stipulated Joint R., Ex. B].)

Both Policies define "your product" to mean

      1.     Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
        a.     You;
        b.     Others trading under your name; or
        c.     A person or organization whose business or assets you have acquired; and
      2.     Containers (other than vehicles) materials, parts or equipment furnished in connection with such goods or products.

(No. 21-1 at 35 [Stipulated Joint R., Ex. A]; No. 21-2 at 15 [Stipulated Joint R., Ex. B].)   In addition, both Policies define "your product" to include

      1.     Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and
      2.     The providing of or failure to provide warnings or instructions.

*Id.* Finally, both Policies define "your product" not to include "vending machines or other

property rented to or located for the use of others but not sold." *Id.*

Both Policies define "your work" to mean

1. Work or operations performed by you or on your
behalf; and
2. Materials, parts or equipment furnished in
connection with such work or operations.

*Id.* Both Policies also define "your work" to include

1. Warranties or representations made at any time with
respect to the fitness, quality, durability, performance
or use of "your product"; and
2. The providing of or failure to provide warnings or
instructions.

*Id.*

Finally, the Umbrella Policy excludes from coverage "property damage" to "impaired

property" or property that has not been physically injured, arising out of:

1. A defect, deficiency, inadequacy or dangerous
condition in "your product" or "your work";
or
2. A delay or failure by you or anyone acting on
your behalf to perform a contract or
agreement in accordance with its terms.
This exclusion does not apply to the loss of use of
other property arising out of sudden and accidental
physical injury to "your product" or "your work" after
it has been put to its intended use.

(No. 21-2 at 8 [Stipulated Joint R., Ex. B].)

## II.     GOVERNING LEGAL STANDARDS

### A.     Legal Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment

as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material

fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material

facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[3] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[3]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## B.     Legal Standard Governing Plaintiff's Claims

The parties agree that New York law governs the claims in this action.  A federal court sitting in a diversity case applies the choice of law rules of the forum state.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020 (1941).  Under New York law, the court must apply the law of the state with the "most significant interest in the case."  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 175 (2d Cir.2000).  Here, as Ohio Casualty points out, and Northbrook agrees, New York has the greatest interest in this litigation because the insured, Lewis & Clinch, is a New York corporation and the insurance contracts at issue were issued in New York.  Therefore, the Court will apply New York law when deciding the current motions.

Under New York law, an insurer's obligation to indemnify an insured arises from the insurance contract.  *See Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.*, 961 F.2d 387, 389 (2d Cir.1992).  In New York, the language of an insurance contract is "interpreted according to common speech and consistent with the reasonable expectation of the average insured."  *Dean v. Tower Ins. Co. of New York*, 979 N.E.2d 1143, 1145, 19 N.Y.3d 704, 708, 955 N.Y.S.2d 817, 818 (2012) (quoting *Cragg v. Allstate Indem. Corp.*, 950 N.E.2d 500, 17 N.Y.3d 118, 122, 926 N.Y.S.2d 867 (2011)).  "[A]mbiguities in an insurance policy are to be construed against the insurer."  *Dean*, 979 N.E.2d at 1145, 19 N.Y.3d at 708, 955 N.Y.S.2d at 818 (quoting *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 46 N.Y.2d 351, 353, 413 N.Y.S.2d 352 (1978)).

"Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage."  *Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687, 98 N.Y.2d 208, 218, 746 N.Y.S.2d 622 (2002).  "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and

unmistakable language, is subject to no other reasonable interpretation, and applies in the

particular case." *Hotel des Artistes, Inc. v. General Acc. Ins. Co. of Am.*, 775 N.Y.S.2d 262, 268,

9 A.D.3d 181, 189 (App. Div. 2004)[4] (citing *Continental Cas. Co. v. Rapid-Am. Corp.*, 609

N.E.2d 506, 80 N.Y.2d 640, 652, 593 N.Y.S.2d 966 (1993); *Throgs Neck Bagels, Inc. v. GA Ins.

Co.*, 671 N.Y.S.2d 66, 241 A.D.2d 66, 71 (1998)). "Further, policy exclusions are not to be

extended by interpretation or implication, but are to be accorded a strict and narrow

construction." *Id.* (quoting *Incorporated Vill. of Cedarhurst v. Hanover Ins. Co.*, 675 N.E.2d

822, 89 N.Y.2d 293, 298, 653 N.Y.S.2d 68 (1996) (quotations omitted)). Finally, "after an

insurer establishes that a policy exclusion applies, the burden shifts to the policyholder to prove

that an exception to that exclusion applies." *Ment Bros. Iron Works Co., Inc. v. Interstate Fure

& Cas. Co.*, 702 F.3d 118, 122 (2d Cir. 2012) (citing *Northville Indus. Corp. v. Nat'l Union Fire

Ins. Co. of Pittsburgh*, 679 N.E.2d 1044, 89 N.Y.2d 621, 634, 657 N.Y.S.2d 564 (1997)).

## III.     ANALYSIS

### A.     Whether Damages to Unit 2's Ringfeders, Wicket Gates and/or Draft Tube Gate Seals Are Covered Under the Insuring Grants of the Policies?

In support of its motion for summary judgment, and in opposition to Northbrook's

motion for summary judgment, Ohio Casualty argues that the Policies are not a surety for Lewis

& Clinch's defective work, and consequently, Lewis & Clinch cannot be indemnified for the

repair and/or replacement of Unit 2's Ringfeders and wicket gates. (*See* Dkt. No. 23 at 7-8

[Ohio Casualty's Mem. of Law in Chief]; Dkt. No. 27-1 at 2-5 [Ohio Casualty's Opp'n Mem. of

Law].) In support of its motion for summary judgment, and in opposition to Ohio Casualty's

---

[4]     Abrogated on other grounds by *KeySpan Gas East Corp. v. Munich Reinsurance America, Inc.*, 15 N.E.3d 1194, 23 N.Y.3d 583, 992 N.Y.S.2d 185 (2014).

motion for summary judgment, Northbrook argues that its damages resulted from physical injury that Lewis & Clinch caused to Northbrook's draft tube gate seals, other than, and in addition to, Lewis & Clinch's work. (*See* Dkt. No. 24-4 at 5-11 [Northbrook's Mem. of Law in Chief]; Dkt. No. 28-1 at 1-4 [Northbrook's Opp'n Mem. of Law].)

To be sure, the Policies "do[] not insure against faulty workmanship in the work product itself but rather faulty workmanship in the work product which creates a legal liability by causing bodily injury or property damage to something other than the work product." *George A. Fuller Co. v. U.S. Fid. & Guar. Co.*, 613 N.Y.S.2d 152, 155, 200 A.D.2d 255, 259 (N.Y. App. Div. 1994). *See also I.J. White Corp. v. Columbia Cas. Co.*, 964 N.Y.S.2d 21, 105 A.D.3d 531 (N.Y. App. Div. 2013); *Transp. Ins. Co. v. AARK Constr. Grp., Ltd.*, 526 F. Supp. 2d 350 (E.D.N.Y. 2007).

In *Fuller*, the court held that the underlying complaint did not allege an "occurrence" resulting in "property damage" as those terms are defined by the defendant's CGL policy because there, the insured property owner claimed that certain construction work was done improperly, necessitating unnecessary construction costs and resulting in diminished value of the property. *See Fuller*, 613 N.Y.S.2d at 256-259. The court there found that the allegations "do not involve damage caused by a 'continuous or repeated exposure to substantially the same general harmful conditions,' which, in accordance with the policy's terms, would constitute an 'occurrence' but, rather, intentional cost-saving or negligent acts only affecting [the insured property owner's] economic interest in the building." *Id.*, at 259.

Conversely, in *I.J. White*, the court, distinguishing *Fuller*, found that the claimed damages were covered by the CGL policy in that case. *See I.J. White*, 964 N.Y.S.2d 21, 105 A.D.3d at 532 (citing *Fuller*, 613 N.Y.S.2d at 155, 200 A.D.2d at 259). There, the insured, a

bakery, claimed damages to its cake products resulting from the improper operation of a freezer system due to the cakes emerging from the freezer at the wrong temperature, resulting in damage during the cutting process.  *See I.J. White*, 964 N.Y.S.2d 21, 105 A.D.3d at 531.  The insured further claimed damages in the form of its loss of use of the freezer and the facility it constructed to house the freezer during the eight months it took to repair the equipment.  *See id.*, at 532.  The court noted that there, as here, but unlike in *Fuller*, the insured was seeking coverage for damage caused by faulty workmanship to something other than the work product.  *See id.*  In other words, the court noted, in *Fuller*, the claimed damage occurred to the work product itself, whereas in *I.J.*, the claimed damage occurred to the cakes, not the freezer.  *See id.*

Similarly, here, Northbrook's claims of damage to the draft tube gate seals is "property damage" resulting from an "occurrence" under the terms of the Policies.  Damage to the Ringfeders and wicket gates, resulting from Lewis & Clinch's faulty work product, does not fall under the Policies' definition of "property damage."  Consequently, damages to Unit 2's Ringfeders and wicket gates are not covered under the insuring grants of the policies, but damages to the draft tube gate seals are covered.

> ### B.     Whether the Loss of Profits Is Property Damage Covered Under the Insuring Grants of the Policies?

In support of its motion for summary judgment, and in opposition to Northbrook's motion for summary judgment, Ohio Casualty argues that the loss of profits is not covered under the insuring grants of the Policies because it is not "property damage" as defined by the Policies. (*See* Dkt. No. 23 at 9-17 [Ohio Casualty's Mem. of Law in Chief]; Dkt. No. 27-1 at 5-9 [Ohio Casualty's Opp'n Mem. of Law].)  In support of its motion for summary judgment, and in opposition to Ohio Casualty's motion for summary judgment, Northbrook argues that its loss of

profits arose because of property damage and are therefore covered by the Policies. (*See* Dkt. No. 24-4 at 11-15 [Northbrook's Mem. of Law in Chief]; Dkt. No. 28-1 at 4-16 [Northbrook's Opp'n Mem. of Law].)

In support of its position that a loss of profits is covered by the Policies, Northbrook principally relies on *Aetna Casualty & Surety Co. v. General Time Corp.*, 704 F.2d 80 (2d Cir. 1983). The background of that action involved a breach of warranty suit against General Time by Flair Manufacturing Co. ("Flair") due to defects in electric motors it purchased from General Time and used as component parts of zone valves in radiators, which Flair manufactured. Flair prevailed in that lawsuit, having been awarded over one million dollars in damages, including damages for lost profits attributable to General Time's defective motors. Thereafter, Aetna brought an action against General Time to recover its contribution to the damages awarded to Flair. The District Court found that the claim of lost profits against General Time was not covered by its CGL and Umbrella policies with Aetna and that the damage to Flair's zone valves due to the incorporation of General Time's defective motors was an "occurrence" under the terms of the policies. On appeal, the Court of Appeals for the Second Circuit affirmed the District Court's holding insofar as it found that the damage to Flair's zone valves was an occurrence but reversed the District Court's decision that Flair's claim of lost profits was not covered by the policies. *See General Time*, 704 F.2d at 81-82.

The Court of Appeals concluded that the District Court's interpretation of the term, "property damage," as used in the policies, to eliminate loss of profits resulting from the physical injury to Flair's property is unsupported by New York law. *See id.*, at 83. There, the Court noted that Aetna's umbrella policy defined "property damage" to mean "injury to or destruction of tangible property (other than property owned by the insured) and all direct and consequential

loss resulting therefrom." *Id.*, at 83-84. The Court principally relied on the New York Court of Appeals' decision in *Thomas J. Lipton, Inc. v. Liberty Mutual Ins. Co.*, 314 N.E.2d 37, 34 N.Y.2d 356, 357 N.Y.S.2d 705 (1974), that all claims of damages, including loss of profits, were covered by the policies in that action.

Ohio Casualty distinguishes *General Time* on the ground that the underlying definition of "property damage" in the Aetna policies differs from the definition in the Policies here. Ohio Casualty also distinguishes *Lipton* on the grounds that there, the Court of Appeals focused on whether the claimed damages were excluded from coverage rather than the issue presented here, which is whether lost profits are covered under the Policies.

To be sure, the Policies here define "property damage," in relevant part, as "physical injury to tangible property, including all resulting loss of use of that property" whereas the Aetna umbrella policy's definition of property damages in *General Time* included "injury to or destruction of tangible property . . . and all direct and consequential loss resulting therefrom." *General Time*, 704 F.2d at 83-84. The Court in *General Time* noted that this definition "is simply a succinct statement of the general rule of law which New York has adopted and which we here apply." *Id.* at 84 (citing cases). Judge Kaufman, concurring in the holding in *General Time*, pointed out, as does Ohio Casualty here, that *Lipton*, relied on by the majority, "did not center on coverage of profits, but rather on whether all damages resulting from a recall of Lipton's products were excluded pursuant to a policy provision which purported to limit the insurer's liability in the event of a recall of defective goods." *Id.* (Kaufman, C.J., concurring). However, Judge Kaufman went on to explain that, since New York courts have not provided clear guidance on the issue of whether lost profits are recoverable, including the definition of consequential damages, the Court is left with the ambiguous terms in the Aetna policies, which

must be construed most favorably to the insured.  *See id.*, at 85.

It is important to note, however, that, as the majority in *General Time* acknowledged, the New York Court of Appeals in *Lipton* ultimately concluded that "all claims for damage asserted by Lipton . . . in the damages action fall within the coverage of both the . . . policies."  *Lipton*, 314 N.E.2d at 39, 34 N.Y.2d at 361-362.  As laid out by the trial court in the *Lipton* case, Lipton claimed "substantial property damage, both direct and consequential, including loss of profits, good will and expenses in connection with the occurrence."  *Thomas J. Lipton, Inc. v. Liberty Mutual Ins. Co.*, 335 N.Y.S.2d 853, 854, 71 Misc.2d 199, 201 (N.Y. Sup. Ct. 1972).  There the court explained that the special multi-peril policy provided that the insurer "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence."  *Id.*, at 855, 71 Misc.2d at 202.  As defined in that policy "damages" includes "damages for loss of use of property resulting from property damage" and "property damage" is defined as "injury to or destruction of tangible property."  *Id.*, at 856, 71 Misc.2d at 203.  Accordingly, regardless of the issue presented to the Court of Appeals in *Lipton*, its holding nonetheless supports Northbrook's argument that loss of profits are covered where, as here, a policy provides coverage for damages for loss of use.

For further support, Northbrook relies on *I.J. White Corp. v. Columbia Cas. Co.*, 964 N.Y.S.2d 21, 105 A.D.3d 531 (N.Y. App. Div. 2013) and *Hotel des Artistes, Inc. v. General Acc. Ins. Co. of Am.*, 775 N.Y.S.2d 262, 268, 9 A.D.3d 181, 189 (App. Div. 2004).  In both cases the policies at issue defined "property damage" to mean, as the Policies here define the term, "physical injury to tangible property, including all resulting loss of use of that property."  *I.J. White*, 964 N.Y.S.2d at 22-23, 105 A.D.2d at 531; *Hotel des Artistes*, 775 N.Y.S.2d at 265, 9

A.D.3d at 184. In *I.J. White*, the court, in addition to finding that damage to the cakes was an occurrence, also found that the loss of use of the facility housing the freezer was covered by the terms of the policy. *See I.J. White*, 964 N.Y.S.2d at 23, 105 A.D.2d at 532. To be sure, damages for lost profits was not sought in that case. However, in *Hotel des Artistes*, damages for business interruption were sought due to the hotel's unreasonable delay in accomplishing repairs to the business of a tenant after the hotel was damaged by fire. *See Hotel des Artistes*, 775 N.Y.S.2d at 264, 9 A.D.3d at 183. Although primarily concerned with the issue of whether certain policy exclusions applied to negate coverage, the court first concluded that the types of damages sought, including losses related to business interruption, were because of property damage as defined in the policy. *See id.*, at 267-268, 9 A.D.3d at 188.

Moreover, the cases cites by Ohio Casualty in support of its argument that lost profits are not property damage, and therefore, are not covered here, are distinguishable for the reasons explained by Northbrook in its opposition memorandum of law. (*See* Dkt. No. 28-1 at 4-8, 13-14 [Northbrook's Opp'n Mem. of Law] [discussing *Camalloy Wire v. National Union Fire Ins. Co.*, 695 N.Y.S.2d 562, 264 A.D. 2d 667 (N.Y. App. Div. 1999); *Willets Point Contr. Co. v. Hartford Ins. Group*, 429 N.Y.S.2d 230, 75 A.D.2d 254 (N.Y. App. Div. 1980), aff'd, 423 N.E.2d 42, 53 N.Y.2d 879, 440 N.Y.S.2d 619 (1981); *County of Monroe v. Travelers Ins. Co.*, 419 N.Y.S.2d 410, 100 Misc.2d 417 (N.Y. Sup. Ct. 1979); *United States Fidelity & Guaranty Co. v. Barron Industries, Inc*., 809 F. Supp. 355 (M.D. Pa. 1992)].)

Specifically, the court in *Camalloy Wire*, in a one paragraph order, dismissed a claim for lost profits upon the sale of property attributable to negative publicity after an oil spill. The court based its ruling on the fact that such damages are distinct from any property damage caused by the spill in terms of when they arose and what they encompass and that they do not

constitute "property damage" caused by "pollution conditions" to "tangible property" as required by the policy. *Camalloy Wire*, 695 N.Y.S.2d at 562, 264 A.D. 2d at 668. Accordingly, the policy terms in that case are meaningfully different from the relevant terms in the Policies here. In addition, the lost profits in *Camalloy Wire* are temporally more distant from the property damage to tangible property in this case.

In *Willets Point*, the County's contractor failed to allow for egress and ingress to businesses along a road construction project, resulting in a loss of profits to one of those businesses, a gas station. The court found that the claimed loss of profits was subject to an exclusion from coverage under the general policy and that such lost profits alone would not be covered under the umbrella policy where the terms of that policy required "injury to or destruction of tangible property" as opposed to the broader terms in the general policy which provided coverage for "loss of use of tangible property which has not been physically injured." *See Willets Point*, 429 N.Y.S.2d at 233, 75 A.D.2d at 259. Here, the lost profits are sought as a result of Northbrook's inability to operate Unit 2 due to damage to tangible property, i.e., the draft tube gate seals, as opposed to the lost profits in *Willets Point*, which were the sole damages claimed.

In *County of Monroe*, a contractor was hired by the County to construct a sewer project, which involved digging a tunnel to accommodate sewer lines beneath a canal. In the process of digging the tunnel, the canal collapsed, causing extensive flooding. The contractor sought damages from the County for, among other things, loss of profits, associated with the alleged failure to advise the contractor of site conditions. The County's insurance carrier argued that the contractor's complaint alleged no property damage, to which the court agreed. *See id.* The court

in *County of Monroe*, found no coverage for lost profits because there, unlike here, there was no damage to tangible property. *See County of Monroe*, 419 N.Y.S.2d at 413, 100 Misc.2d at 421-422.

Finally, in *Baron Industries*, Baron manufactured a fan that was alleged to have caused fire damage at the job site of a construction project. Baron was sued for property damage stemming from its defective fan. Baron's insurer sought a declaration that it had no duty to defend Baron. The policy there, like here, defined property damage as "physical injury to tangible property, including all resulting loss of use of that property, or loss of use of tangible property that is not physically injured." *Baron Industries, Inc*., 809 F. Supp. at 360. The insurer argued that the policy does not cover economic losses stemming from the defective performance of the insured. The court, applying Pennsylvania law, concluded that, in addition to damages for economic interests not covered by the policy, Baron was also sued for physical injury to wiring, insulation and duct work, all of which come within the policy's definition of property damage. *See id.*, at 360-361. In addition, the court held that the policy further covers the loss of use of the facility due to the failure of Baron's defective product. *See id.* Similarly, here Northbrook seeks damages for physical injury to the draft tube gate seals in addition to the loss of use of Unit 2. Accordingly, Ohio Casualty's reliance on *Baron Industries* is misplaced.

For these reasons, Northbrook's claimed loss of profits as a result of the loss of use of Unit 2 is covered under the insuring grants of the Policies .

### C.     Whether Coverage for Damage to the Ringfeders and Wicket Gates Is Excluded

In support of its motion for summary judgment, and in opposition to Northbrook's motion for summary judgment, Ohio Casualty argues that damage to the Ringfeders and wicket

gates is excluded from coverage under one or more of certain exclusions of the Policies. (*See* Dkt. No. 23 at 18-24 [Ohio Casualty's Mem. of Law in Chief]; Dkt. No. 27-1 at 10-14 [Ohio Casualty's Opp'n Mem. of Law].) In support of its motion for summary judgment, Northbrook argues that Ohio Casualty cannot meet its burden to show that Northbrook's claims are excluded under any of the exclusions asserted in its Complaint. (*See* Dkt. No. 24-4 at 15-25 [Northbrook's Mem. of Law in Chief].) In opposition to Ohio Casualty's motion for summary judgment, Northbrook argues that (1) it should be granted summary judgment regarding the exclusions asserted by Ohio Casualty in its Complaint but not briefed in Ohio Casualty's motion for summary judgment, and (2) the exclusions asserted by Ohio Casualty in support of its motion for summary judgment are inapplicable to the underlying claims. (*See* Dkt. No. 28-1 at 1, 16-21 [Northbrook's Opp'n Mem. of Law].)

To be sure, Ohio Casualty asserts several policy exclusions in support of four of its causes of action in the Complaint, but only seeks summary judgment declaring that some of those exclusions bar coverage for indemnification of Lewis & Clinch for damage to the Ringfeders and wicket gates. Because the court has determined in Part III.A. of this Decision and Order that the Policies' insuring grants do not cover indemnification of Lewis & Clinch for damage to the Ringfeders and wicket gates, this portion of Ohio Casualty's motion for summary judgment is denied as moot.

Moreover, Ohio Casualty fails to oppose Northbrook's motion for summary judgment in its favor on the grounds that certain of the exclusions cited in support of Ohio Casualty's second and fourth causes of action are inapplicable. Accordingly, to that extent, at the very least, Northbrook's argument for the dismissal of those causes of action meet the lightened burden created by Ohio Casualty's failure to respond to it. *See, supra,* Part II.A. of this Decision and

Order.  In any event, as indicated in Part II.B. of this Decision and Order, Ohio Casualty bears the burden to show that a policy exclusion defeats coverage, which Ohio Casualty has plainly failed to do in this regard.  Accordingly, to the extent Northbrook seeks summary judgment in its favor regarding the inapplicability of exclusions in the second and fourth causes of action, its motion is granted.

In summary, the Court finds as a matter of law that (1) the insuring grants of the Policies do not cover indemnification of Lewis & Clinch for damage to Unit 2's Ringfeders and wicket gates; (2) the insuring grants of the Policies do cover indemnification of Lewis & Clinch for damage to Unit 2's draft tube gate seals; (3) the insuring grants of the Policies do cover indemnification of Lewis & Clinch for lost profits associated with a loss of use of Unit 2 as a result of damage to the draft tube gate seals; and (4) Ohio Casualty has failed to meet its burden to show that indemnification of Lewis & Clinch for damage to Unit 2's draft tube gate seals or for lost profits associated with a loss of use of Unit 2 as a result of damage to the draft tube gate seals are excluded from coverage under the Policies.

**ACCORDINGLY**, it is

**ORDERED** that Ohio Casualty's motion for summary judgment (Dkt. No. 23) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Northbrook's motion for summary judgment (Dkt. No. 24) is **GRANTED** in part and **DENIED** in part.  The Clerk is directed to enter judgment as set forth above and close this case.

Dated: November 13, 2014
        Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge